# UNITED STATES DISTRICT COURT
# DISTRICT OF ALASKA

| | |
|---|---|
| FURIE OPERATING ALASKA, LLC, | |
| Plaintiff, | 3:12-CV-00158 JWS |
| vs. | ORDER AND OPINION |
| U.S. DEPARTMENT OF HOMELAND SECURITY; SECRETARY OF HOMELAND SECURITY JANET NAPOLITANO, in her official capacity; U.S. CUSTOMS AND BORDER PROTECTION; and ACTING COMMISSIONER DAVID V. AGUILAR, in his official capacity, | [Re: Motion at docket 24] |
| Defendants. | |

## I. MOTION PRESENTED

At docket 24, defendant U.S. Department of Homeland Security ("DHS"), Secretary of Homeland Security Janet Napolitano, U.S. Customs and Border Protection ("CBP"), and CBP Acting Commissioner David Aguilar (collectively, the "Government" or "defendants") ask the court to dismiss plaintiff's complaint under Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure. The Government argues that the court lacks subject matter jurisdiction over the matter because there has been no final agency action and thus judicial review of CBP's $15 million sanction against plaintiff Furie

Operating Alaska, LLC ("plaintiff" or "Furie") pursuant to the Administrative Procedure Act ("APA") is not available. Furie opposes the motion at docket 36. The Government's reply is at docket 32. Oral argument was not requested and would not assist the court.

## II. BACKGROUND

The challenged agency action at issue relates to Furie's 2011 transportation of the jack-up rig Spartan 151 (the "Rig") from the Gulf of Mexico in Texas to Vancouver, British Columbia, using a foreign vessel and then from Vancouver to Cook Inlet, Alaska, using a U.S. vessel. Furie's use of a foreign vessel to transport the Rig implicates the Jones Act, specifically 46 U.S.C. § 55102(b), which provides that no "merchandise" can be transported by water between points in the United States to which the coastwise laws apply, either directly or via a foreign port, unless the vessel transporting the merchandise is one that is built in, documented under the laws of, and owned by citizens of the United States. The Jones Act does not define the term "merchandise" in detail, but it provides that the term includes valueless material or anything owned by federal, state or local governments.[1] The penalty for violating this U.S.-vessel requirement is forfeiture of the merchandise transported or, alternatively, a sanction in an amount equal to the value of the merchandise or the actual cost of the transportation of the merchandise, whichever is greater.[2]

The U.S.-vessel requirement can be waived by the DHS Secretary, but only if the Secretary "considers it necessary in the interest of national defense . . . ."[3] Furie sought and received a waiver from then-Secretary Michael Chertoff in 2006 when Furie had planned to transport a different rig, the Tellus, to Alaska with the use of a foreign-owned vessel. The waiver for the Tellus rig transport was based on Furie's demonstration to DHS that there were no qualified U.S. vessels that could transport the Tellus rig around

---

[1] 46 U.S.C. § 55102(a).

[2] 46 U.S.C. § 55102(c).

[3] 46 U.S.C. § 501(b).

the southern tip of Africa or South America (it was too large to pass through the Panama Canal) and the rig was needed in Alaska to help alleviate South Central Alaska's natural gas shortage, which was affecting defense-related facilities in Alaska. Furie ended up unable to transport the Tellus rig in 2006 because of repairs and legal disputes. In the meantime, the Tellus rig was sold to foreign interests, and Furie could no longer use it for its natural gas exploration in Alaska.

By 2010, Furie had made alternate plans, entering into a contract to use the Rig instead. It had also located a different vessel to transport the Rig to Alaska, but again the vessel was foreign-owned because the U.S. fleet did not include one capable of transporting the Rig. Furie requested that Secretary Napolitano reconfirm the Jones Act waiver that Secretary Chertoff had granted in 2006. When Furie did not get a response, it informed CBP of its intention to ship the Rig to Alaska with a foreign vessel based on the former waiver. CBP informed Furie that the waiver was no longer in affect and that it would need a new waiver or face penalties if it transported the Rig as planned.

Furie sought a new waiver from Secretary Napolitano but was denied in March of 2011. The denial was based on the fact that the Maritime Administration said U.S.-owned barges existed that could transport the Rig from Texas to Alaska. That information turned out to be wrong, and on March 22, 2011, the Maritime Administrator advised CBP that a U.S.-owned vessel was not available for the planned voyage. Furie anticipated that the waiver would be granted given the corrected information, and thus, in March of 2011 Furie had the Rig depart from Texas using a foreign-owned vessel for transportation.

In May of 2011, after not hearing from CBP on the matter, Furie asked Secretary Napolitano for a reconsideration of her denial of the waiver. It asked the Secretary for an expedited decision because the Rig was in route to Alaska and scheduled to arrive at the end of May. On May 20, 2011, Secretary Napolitano denied the request but indicated that DHS wanted to work with Furie to find an equitable way to allow transportation of the Rig to Cook Inlet. She indicated that CBP officials would be

prepared to meet with Furie representatives to discuss possible mitigation of the Jones Act penalties that were likely to result if the Rig were offloaded in Alaska. A few days later, representatives for Furie discussed possible penalties with CBP official Glen Vereb. Vereb stated that CBP would not seize the Rig if it were transported to Alaska, but that it would pursue penalties based on Furie's violation of the Jones Act. Furie advocated for mitigated penalties by sending an email to CBP that set forth factors it believed justified mitigation, and the Rig was diverted to Vancouver while Furie awaited a resolution of the penalty matter.

After further negotiations and communications regarding penalty mitigation, in July of 2011, CBP official Allen Gina sent an email to Furie indicating that if the Rig were to complete its journey to Alaska, CBP would find that Furie violated the Jones Act, § 55102, because of its use of a foreign vessel to transport the Rig on a portion of the Rig's journey to Alaska. The email also stated that the penalty for such a violation was either forfeiture of the Rig or a penalty in the amount of the value of the Rig, which CBP valued at $46 million, or the cost of the transportation, which CBP stated was $9.2 million. Gina stated in the email that he would recommend that a mitigated penalty of $6.9 million be assessed against Furie, which represented 15 percent of what CBP believed was the value of the Rig.

On July 22, 2011, the Rig left Vancouver for Alaska, towed by a U.S. vessel. It arrived in Alaska a few weeks later. On October 13, 2011, CBP sent Furie a notice of violation based on the transport of the Rig from Texas to Alaska via in part a non-qualifying vessel. The notice assessed a penalty of $15 million, which it stated to be the full amount of the Rig's value. On December 12, 2011, Furie submitted a petition for mitigation, which CBP denied in January of 2012. In March of 2012, Furie submitted a supplemental petition for mitigation. CBP denied that request in May of 2012. On June 6, 2012, Furie informed CBP that it would file a request for reconsideration, but the next day CBP informed Furie that the regulations did not authorize a request for

reconsideration and that if Furie did not pay the full $15 million by the next day, it would forward the matter for a collection action.

CBP sent a bill for $15 million to Furie on June 16, 2012. The bill indicated that payment was due within ten days. CBP sent another $15 million bill to Furie on June 30, 2012, which again noted that payment was due within ten days. On July 9, 2012, Furie submitted a request for reconsideration to CBP, but the next day CBP sent a letter to Furie stating that it would not consider the request to reconsider its decision. Furie asked that its request for reconsideration be forwarded to the Acting Commissioner of the CBP for his personal review, but that request was also denied. Furie received a third bill for the $15 million penalty on July 19, 2012. It did not pay the bill and filed this lawsuit.

The Government argues that CBP's assessment of a $15 million Jones Act penalty against Furie does not constitute "final agency action" reviewable under the APA. It argues that its assessment of the penalty is not final until CBP refers the matter to the Department of Justice and the Department of Justice accepts the referral and seeks to enforce the penalty in court, relying primarily on *Nippon Miniature Bearing Corp. v. Weise*.[4] Furie argues that even though the Department of Justice would have to bring a debt collection action to enforce payment, CBP's decision to impose the $15 million penalty is final agency action at this point, because there are no further steps in the deliberative process and because a penalty does not need to be self-effectuating to be final, citing *Sackett v. EPA*.[5]

### III. STANDARD OF REVIEW

This motion is properly considered under Federal Rule of Civil Procedure 12(b)(1) because the issue of whether agency action is final and thus eligible for judicial

---

[4] 230 F.3d 1131 (9th Cir. 2000).

[5] 132 S. Ct. 1367, 1372 (2012).

review under the APA is a matter of sovereign immunity,[6] which implicates the court's subject matter jurisdiction.[7]

In order to survive a defendant's motion to dismiss, a plaintiff has the burden of proving jurisdiction.[8] "Unless the jurisdictional issue is inextricable from the merits of a case, the court may determine jurisdiction on a motion to dismiss for lack of jurisdiction under Rule 12(b)(1)."[9] In such a situation, the court can consider evidence outside of the pleadings related to jurisdiction.[10] If the defendants bring a facial attack on subject matter jurisdiction, the court assumes the factual allegations in the plaintiff's complaint are true and draws all reasonable inferences in the plaintiff's favor.[11] The court does not, however, accept the truth of legal conclusions cast in the form of factual allegations.[12] If a factual attack on subject matter jurisdiction is made or factual disputes arise related to jurisdiction, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."[13]

---

[6] *Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998) ("[W]hile the APA does not confer a district court with jurisdiction, it does provide a waiver of sovereign immunity in suits seeking review of a federal agency action under §1331.").

[7] *Vacek v. U.S. Postal Serv.*, 447 F.3d 1248, 1250 (9th Cir. 2006) ("Sovereign immunity is an important limitation on the subject matter jurisdiction of federal courts.").

[8] *Tosco v. Cmtys. for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2000).

[9] *Kingman Reef Atoll Invs., L.L.C. v. United States*, 541 F.3d 1189, 1195 (9th Cir. 2008).

[10] *Id.* (quoting *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987)).

[11] *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009).

[12] *Id.*

[13] *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) (internal quotations omitted).

## IV. DISCUSSION

Judicial review of CBP's penalty assessment under the Jones Act is only warranted under the APA if that action is made reviewable by statute or if it is "final agency action for which there is no other adequate remedy in a court."[14] The CBP's penalty assessment is not made reviewable under the Jones Act, and thus the court can only review the penalty assessment if it constitutes final agency action for which there is no other adequate remedy in court.

### A. Final agency action

Agency action is final if the action (1) "mark[s] the culmination of the agency's decisionmaking process" and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow."[15] Put in other terms, the court must consider "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."[16]

The court concludes that the first part of the finality test is met in this case. CBP's decision to impose a $15 million penalty on Furie for a Jones Act violation was the culmination of the agency's decision-making process. The Government asserts that the mitigation petition process applicable to custom violations under the Tariff Act, set forth in 19 U.S.C. §1618 and 19 C.F.R. Part 171, has customarily been applied to the imposition of Jones Act penalties. Under such a process, once a penalty has been assessed, the violator may file a petition for penalty mitigation and a written decision will issue. Once that decision is rendered, the violator can submit a supplemental petition. Furie complied with both procedures. It also requested further reconsideration, but CBP informed Furie that there were no more procedures by which Furie could seek a

---

[14] 5 U.S.C. §704.

[15] *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotations omitted).

[16] *Indus. Customers of NW Utils. v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005) (quoting *Franklin v. Massachusetts,* 505 U.S. 788, 797 (1992)).

reconsideration. It proceeded to send Furie three bills in the amount of $15 million. Therefore, the court concludes that CBP had "rendered its last word on the matter."[17]

The Government's argument is primarily focused on the second prong of the finality test: obligations and legal consequences. As noted above, in order to be final agency action, it must be one "by which rights *or* obligations have been determined, *or* from which legal consequences will flow."[18] In order to determine whether a right or obligation has been determined, the court looks at whether the agency decision has a "'direct and immediate . . . effect on the day-to-day business' of the subject party,"[19] and it looks at "whether the [action] has the status of law or comparable legal force, and whether immediate compliance with its terms is expected."[20] The court concludes that CBP's imposition of the penalty had the status of law once CBP denied Furie's mitigation petitions and immediate compliance was expected. CBP sent Furie multiple bills, and each bill indicated that payment was due and payable.[21] The second and third bills stated that if payment was not timely received Furie could incur additional sanctions.[22] The $15 million penalty assessed by CBP certainly imposed an obligation on Furie.

The Government argues that until the Department of Justice undertakes an enforcement action to collect the debt owed to the Government, CBP has no obligation to pay the penalty. It cites *Nippon* in support. In *Nippon*, the Ninth Circuit held that the penalty CBP imposed on a company for falsely describing imported goods in violation of

---

[17]*Whitman v. Am. Trucking Ass'n, Inc.*, 531 U.S. 457, 478 (2001).

[18]*Bennett*, 520 U.S. at 178 (emphasis added).

[19]*Ukiah Valley Med. Ctr. v. F.T.C.*, 911 F.2d 261, 264 (9th Cir. 1990) (quoting *F.T.C. v. Standard Oil*, 449 U.S. 232, 239 (1980)).

[20]*Id.*

[21]Docs. 27-5, 27-7, 27-8.

[22]Docs. 27-7, 27-8.

the Tariff Act, 19 U.S.C. § 1592, was not a final agency action because the company had no obligation to pay the penalty until the Court of International Trade ("CIT") conducted a *de novo* review of the penalty and determined whether the penalty was in fact due and what the amount of the penalty would be.[23] *Nippon* is distinguishable because its holding is particular to the penalties imposed under § 1592 and the specific process set forth in that statute. Pursuant to § 1592(e), the CIT must conduct a *de novo* review of any penalty assessed under the statute, determining whether a penalty was appropriate and what the amount should be.[24] Section 1592(e) is not applicable to the Jones Act, and there is no similar *de novo* review procedure delineated for Jones Act penalties. Furthermore, the CIT does not have jurisdiction over Jones Act penalties.[25] If a Jones Act penalty is not paid, the parties agree that the matter is referred to the Department of Justice for an enforcement action in district court.[26]

The Government asserts that the reasoning in *Nippon* would still apply to this case because it should not matter if enforcement proceedings are done in the CIT or in district court. But there is a difference. In a §1592 penalty case, because the CIT essentially determines whether the penalty should be imposed at all and what the penalty amount should be, the CIT hearing essentially functions as an additional

---

[23]*Nippon*, 230 F.3d at 1137.

[24]19 U.S.C. § 1592(e)(1).

[25]*See* 28 U.S.C. §§ 1581-1583; *Horizon Lines, LLC v. United States*, 414 F. Supp. 2d 46, 52 (D.D.C. 2006) (holding that federal district courts, not the CIT, have jurisdiction over cases concerning compliance with U.S. cabotage laws such as the Jones Act).

[26]The parties cite different statutes when discussing the Department of Justice's exclusive power to bring an action to enforce the Jones Act penalty in this case. The Government cites 19 U.S.C. § 1604, 19 C.F.R. § 171.22, and 31 C.F.R. § 904.1. Furie asserts that 19 C.F.R. § 171.22 is only applicable to a mitigated penalty, which is not at issue in this case, and argues that the federal debt collection procedure set forth in 28 U.S.C. § 3001, *et seq.* is applicable. The court need not delve into the statutory framework for penalty enforcement actions. The relevant fact is that the parties do not dispute that the Department of Justice would have to file an action in federal district court to enforce collection of the Jones Act penalty and that the CIT is not the proper court for such an action.

deliberative step in the review process. The Government cites no authority for its assertion that in a run-of-the-mill enforcement action to collect an assessed penalty the district court would review *de novo* both the penalty assessment and penalty amount, and thus the court cannot conclude that *Nippon* is dispositive in Furie's case.

Furthermore, the Supreme Court's more recent decision in *Sackett* calls into question the Government's expansive application of the reasoning in *Nippon*. In *Sackett*, the Supreme Court found that the EPA's issuance of an administrative compliance order under the Clean Water Act was final for purposes of APA review despite the EPA's argument that it was not final because no action had been taken to enforce the order. The compliance order at issue in *Sackett* required the property owners to restore their property in accordance with an EPA plan or risk up to a $75,000 per day fine. The EPA rejected the property owners' request for a hearing to challenge the compliance order, and the owners brought an action for judicial review under the APA. The Ninth Circuit affirmed the district court's dismissal of the action, determining that the compliance order was not final because the government had not filed a judicial action to enforce the order. The Supreme Court reversed and found that the EPA's issuance of the compliance order was final because it was the culmination of the EPA's decision-making process and imposed a legal obligation on the owners to clean up their property, as well as future legal consequences in the form of potential penalties.[27] The Court rejected the Government's argument that because the compliance order had to be enforced by the agency in a judicial enforcement proceeding, it was just a step in the deliberative process. Instead, the Court concluded that the APA provides for judicial review of all final agency actions, not just those that impose a self-executing sanction.[28]

---

[27] *Sackett*, 132 S.Ct. at 1371-72.

[28] *Id.* at 1373.

Based on the reasoning in *Sackett*, the Government's argument that the $15 million penalty is not a final agency action until the Department of Justice initiates a judicial enforcement proceeding is without merit. As the Court stated in *Sackett*:

> [I]t is hard for the Government to defend its claim that the issuance of the compliance order was just 'a step in the deliberative process' when the agency rejected the [owner's] attempt to obtain a hearing and when the next step will either be taken by the [owners] (if they comply with the order) or will involve judicial, not administrative, deliberation (if the EPA brings an enforcement action).[29]

Likewise, the CBP's continued assessment of the $15 million penalty after its denial of Furie's petitions for mitigation is not just a step in the deliberative process when the only actions left to be taken are either payment by Furie or a judicial collection action.

**B. No other adequate remedy**

The Government also uses the fact that the penalty is not self-enforcing to assert that a later-filed enforcement proceeding would provide Furie with an adequate opportunity to remedy the agency action in court. But Furie cannot initiate that enforcement proceeding, nor can it predict when such a proceeding might occur. Instead, under the Government's rationale, Furie must wait until the Government decides to pursue a collection action before it can raise any judicial challenge to the agency's decision. In the meantime, while it waits it is subject to a $15 million penalty and possible sanctions for non-payment, and such a substantial liability certainly interferes with its ability to conduct business. The court agrees with the district court in *Union Pacific Railroad Co. v. U.S. Department of Homeland Security*: "Waiting for the Government to pursue an enforcement action in order to assert its claim as a defense is not the sort of special and adequate review procedure that is envisioned by the APA's provision prohibiting duplicative proceedings."[30] Because Furie has no other adequate

---

[29] *Id.*

[30] 2010 WL 9013003, at * 11 (D. Neb. June 11, 2010)

-11-

remedy in court as to the CBP's final action stemming from Furie's transportation of the Rig to Alaska, judicial review under the APA is allowed.

## V.  CONCLUSION

Based on the preceding discussion, defendants' motion to dismiss at docket 24 is hereby **DENIED**.

DATED this 15th day of April 2013

                        /s/
            JOHN W. SEDWICK
    UNITED STATES DISTRICT JUDGE